Okay, the first case on the docket this morning is 514-0544, In the Interest of L.S., a minor. An attorney from the appellate, Lucas Mette? M-E-T-T-E? Yes. Okay, you may proceed when you're ready. Excuse me. May it please the court, my name is Lucas Mette and I represent the appellant father in this case, Matthew Staley. The minor child in this case, L.S., turned three years old yesterday. He was removed from the home of his family four days after his birth on the basis of allegations of abuse against his older sister. The court found in an adjudicatory hearing that the older sister had suffered from unexplained bruising on her face while left with my client's respondent father. The court further found that Mr. Staley had engaged in an illegal drug sale from the home before the child was born, and that this environment was one that the child should not be brought into, and therefore the child was adjudicated as having suffered from anticipatory neglect. In the three years of this child's life, my client has been subject to random drug testing for his entire life. He has never tested positive. He has engaged in extensive counseling from a number of different sources. I believe that he has dealt with any drug addiction issues. He has not been found to have abused the child at any time during his life, or been caused any neglect or abuse of any child during that time period. This child was removed four days after birth? Yes, Your Honor. So we're talking about a span of four days that he didn't abuse the child? Correct, and then a visitation period as well, Your Honor. He has been offered visitation of once per week. There have been some missed visits, but of course there's been extensive visitation since then as well. The DCFS service plan should be designed to correct the conditions which led to the removal of the child, and the service plan should not be an end in and of itself, but rather it should be a means to the end of ensuring that these parents are prepared to care for the minor child. I would argue that any lack of completion of certain aspects of the service plan should not prevent these children from being returned to the parents because the underlying issues of neglect and or drug use have been dealt with. It seems like there's evidence in the record that the parents not only did not cooperate with DCFS, but fought them tooth and nail. Is that a fair statement? Yes, Your Honor. There's a very contentious relationship in this case between the department and my client, as well as the other appellant, the mother in this case. And that contentious relationship, I would assert, does go both ways. There was an appellate law judge decision as part of a service plan appeal in this case. The appellate law judge reviewed, DCFS's own appellate law judge reviewed their actions in this case and determined that even when the father and mother completed services, they would nonetheless not have that acknowledged. They would be marked as incomplete or unsatisfactory regardless of what they did. The appellate law judge also found that when a counselor would submit a report to the department, even if it was a positive report, it would be spun and twisted against them and used to create the perception something negative. What happened after that report? The ALJ report, Your Honor? Yes. Well, the several aspects of the service plan were changed as a result of that report. All right. And then what happened as far as the parents after the changes? They continued to have a rocky relationship with the department. They did work on the service plan. They completed many aspects of it. There are some they are accused of not completing. For example, my client at the time of the dispositional hearing was unemployed. He had been employed for a time. He was unemployed at the time of the dispositional hearing. He was also homeless, wasn't he? Yes, Your Honor, he was. He was a little rough to return a child to somebody who's homeless. Yes, Your Honor. No one in this case, and certainly not my client, wanted the child to be brought to the homeless shelter. My client was asking the child be returned to live with the appellant mother in this case. He was asking the child be returned to both of their custody, but that the child actually reside with the mother. Failing that, in the alternative, we had asked that the child simply be returned to the mother. Where was the mother living at the time? The mother was living with her parents. She had a stable home with them. Her father testified at the dispositional hearing as well. I cannot recall any concern. I don't believe the judge indicated any concern as to the specifics of that home and whether it's a fit place. The department took the position that simply because she was living with her own father, that was in itself a problem. I don't believe that that should be a problem. I don't think there's anything wrong with having grandparents in the home. In fact, I would argue that they can assist in caring for a child and be very beneficial to the child. Did she leave to live with her parents without telling DCFS? She did. She did not seek DCFS's permission to move. She did move from the Effingham area to the Chicago area, and she did not tell them in advance, no. Another concern from the department was that my client did not have a driver's license. I don't believe that that on its own should be enough, or even combined with any other problems here. He certainly was making it to CORE. I'm unaware of any – I think his transportation caused some problems, was missing some visits. But if a child were to return to him, it wouldn't be something that would hurt the child, as far as I can tell. Was he eligible for a driver's license? I believe that it was something that would have been a financial obstacle. I don't recall off the top of my head whether that's something he would be able to get if he had the finances. I thought I had read that he had no drug conviction. He did have a drug conviction. Somehow it was linked to two. Yes. One older and one very recent, for which he was on probation. And that somehow the driver's license was not available to him because of the old drug conviction. Do you know? I think there may have been some uncertainty and some mixed testimony on that, Your Honor. I am not sure with certainty whether he would have been eligible or not. I know that he did not have one. One of the issues relied on in the court below was a psychological examination, which was very negative regarding my client. I would point out that that was done four months before this child was born. And as I said, this is a child that turned three years old yesterday. All of the counseling from numerous counselors and numerous sources has occurred after that psychological examination. And I don't think that anything in that psychological examination at this point is relevant to hold against my client, although it was relied on in part in the court below. One of the other issues in this case deals with visits. There were a number of visits that were missed. A number were made and a number were missed. As was mentioned before, my client does reside in the Chicago area, so there's some distance there. And there was competing testimony in the court below, and the court did find that the department, that it did not believe the credibility of my client and the respondent mother as to their reasons for missing visits. Many of their visits, they said, were missed due to court appearances and hospital stays. I'd understand if this court is bound by the trial court's decision on credibility, but I would point out that there have been no perjury charges brought against them, and those are things that would be easy to disprove if they, in fact, were not in a hospital or if they were not at a court appearance. There was only one visit that was missed for, per se, an unacceptable reason. I believe that was when there was a competing appointment to get some sort of welfare assistance, which the department said should have been rescheduled. If we look at the missed visits, there's a period cited by the court where they missed 15 out of, it said, 37 visits from February 1st through August. That's a seven-month period. These parents have one visit per week. It was more, wasn't it, when they asked to reduce it? They did not ask to reduce the frequency of the visits. Just before the dispositional hearing, the mother had requested that they be brought from four hours to two hours. She did not feel that it was good for the kids to be confined to a room as small as the visitation room was. I thought that the move had caused the number of visits to be reduced. Yes. Initially, before this more recent period of months, there had been a time when the visits were reduced to once per week, and then they were increased in duration to compensate for that. In the period of visits referenced by the judge below, from February through August, leading up to the dispositional report, the finding was that they missed 15 out of 37 visits. During that entire period, they were attending one visit a week when they made it. I point out that 37 visits really doesn't fit into that time period, and there's a reason why it doesn't fit into that time period. When a visit would be rescheduled, I think any sensible person would say that if the rescheduled appointment is made, that that's a made visit. Here, they're counting it as one missed visit, and then the visit that was made being made. So if you reschedule a visit and make it, that's making one out of two visits. I think that's an inflating of the numbers of missed visits, and I think that they're inflated for the purpose of making this look like there are more visits than there were that were missed. I would argue that that's really a passive assertion, that the number of visits that were made in the opinion of the department didn't seem to be enough to convince a trial judge to return these children home. In this case, at the end of the day, I think as laid out in the SJ case cited in my brief, the goal is really to correct the underlying problems with the parents, to enable the children to be returned home. And the two issues are, are these parents going to neglect the children, resulting in abuse? And does the appellant father have a drug issue? He's attended counseling for both of those issues. She's attended counseling, and he has been drug-free for the entirety of this three-year-old child's life. I believe that based on that, these children were ready to be returned home at the time of the dispositional hearing. You mean to the grandparent's house? Yes, to the mother's home, which was also the grandparent's home where the mother lived. Yes, sir. It was interesting to me that the mother had another child and yet gave it to your client's parents. She did, Your Honor. She was very deceptive about that. She, and of course I don't represent her, but she did have a very contentious relationship with the department. She believed that the child was going to be taken from her, and in fact, Ellis was taken from her on the basis of the older child's adjudication of abuse. So I believe she rightfully believed the child would be taken from her, and she made alternative arrangements before that could happen. And I completely understand her fear, but what was curious to me is she's living with her parents, and yet she gives a newborn baby to the man she's allegedly divorced from, his parents. I was curious about that. I think that... Because that really does give access to your client, to a new child, that I assume he fathered now, that everybody agrees he fathered. There was some deception. I believe it is agreed now that he is the father. I'm not sure if I fully understand exactly the part that the question was about, so please correct me if I'm veering off course here. There was some issue in this case with my client who rightfully or wrongly, I believe rightfully, came to the conclusion that at one point the best thing he could do to help the children at least return to their biological mother, if not for him, was to distance himself from the case. The concern from the department was that the father was the big issue, and the mother was unable to stand up to him, as an allegation that's frequently occurred throughout this case. And again, the testimony is in conflict. I don't believe the trial court judge specifically ruled on what was going on, except that he thought perhaps this divorce was a charade. I see my time has expired. I thank you very much. You'll have an opportunity to come back a little bit. Okay. Mr. Jones. Good morning. Good morning. Good morning. Now, you're actually representing? I represent the intervening foster parents, Paul and Melissa Rodgers, Your Honor. Okay. And may it please the court, I do represent Paul and Melissa Rodgers. We're here to ask you today to affirm the lower court's ruling in its dispositional order. Your Honor, the rulings and findings made by the trial court in this matter are clearly not against the manifest weight of the evidence and should be affirmed. I know this court's aware of the legal standard. The trial court's finding of parental unfitness may not be reversed unless it is contrary to the manifest weight of the evidence. This really isn't an unfitness finding. I mean, this was a dispositional hearing. This is. And the court said that they are currently not fit and able to take care of the children. Absolutely. There's nothing, this wasn't a termination proceeding. Absolutely not. It's a dispositional hearing. So, I mean, the parents still have the opportunity to correct whatever conditions caused the children to be placed other than in their home. Correct. They absolutely do, Judge. And depending on what happens in the permanency hearings that follow and whatever else gets followed prior or thereafter, they do have that right. But here in the dispositional order stage, the standard of review is clearly against the manifest weight of the evidence standard. And that requires that deference be given to the trial court, because they are the finder of the fact, and they are in the best position to observe the conduct and demeanor of the witnesses and the parties. And they have a degree of familiarity with the evidence that a reviewing court cannot possibly obtain, our case law tells us. Therefore, the reviewing court is not to substitute its judgment for that of the trial court regarding credibility of the witnesses, the weight to be given to the evidence, or the inferences to be drawn. And so after three days of hearing, in this case, Judge Heater, the one in the best position to make those assessments, determined that neither one of the natural parents were fit, willing, or able to care for this child. And that order should be affirmed here today. What interaction did your clients have with the appellants here? With the appellants? Yeah, with the parents. Not much, Judge. The visits were all supervised by DCFS. My clients complied with all the orders and what they were required to do. They made the child available for visitation. Visitation has taken place. I've just never seen the parents come in. Granted, I'm the new judge, but I've never seen them. You've never seen the foster parents come in? Yeah. Oh. We've had this child, my clients have had this child under physical custody since the child was a few days old. They are very interested in his best interests. They want to see what's best for him, and they have hired us to do that and to intervene as is allowed by the statute. And so I think it's important to note, too, that when we talk about the statute issue, section 2-27, the health, safety, and intent of the minor remain the guiding principles when issuing an order in the dispositional phase. It is not, as counsel has just suggested, to protect the underlying rights of the parents. The case law is clear. The health, safety, and intent in the interest of the minor remain the guiding principles in what should be done here today. And so after three days of hearing, Judge Eder made his rulings in his dispositional order and, in fact, issued a six-page, single-spaced addendum to support his findings, and they all show a ruling that should be affirmed here today. There are many things in that addendum and in the order to support the findings in regards to Matthew Staley. First of all, Matthew failed to participate for almost a year in these proceedings. He did not cooperate. He failed to contact DCFS. He did not participate in services. He would not submit himself as a respondent in this matter at some point. He appeared at the adjudicatory hearing but refused to take part as a respondent. Instead, only appeared as a witness on behalf of Ashley. He did not feel there was any need to contact DCFS. He felt the proceedings were absurd and that he is being victimized by DCFS. There are also factors as to his home life that the court has already noted here this morning. He could not provide a safe environment for this child. He was living in a homeless shelter at the time of the dispositional hearing. He had been the previous eight months before moving into the homeless shelter living with Ashley's parents in the Chicago area, even though this child was in the Effingham area, 200 miles away. He claimed that he was living with Ashley's parents as a result of a motor vehicle accident. The trial court noted that he had already filed a change of address form with his probation officer, stating that address before the motor vehicle accident. He had no identifiable goals for future housing. He was not employed. He had no means of income, and he had no means to support himself or this child. He claimed to have applied for 150 to 200 jobs over the Internet, but he could not name a single place where he had applied for employment. He did lose his driver's license, as the court noted, following a 2007 felony conviction for possession of heroin with intent to distribute. He had no means of transportation for the future, even though he lived 200 miles away from the child, and he had taken no steps to become licensed, which, despite what counsel suggests, is relevant when you are 200 miles away and have no driver's license to your ability to visit with a child and to develop any sort of relationship with a child. The court noted that LS was taken into DCFS custody within days of his birth because of the incident with his older sister, who was left alone with Matthew Staley when that child was 10 months old and was found to have suffered unexplained major bruising to her face while in his care. In fact, Matthew and Ashley both stipulated at the November 29, 2011 hearing in Ashley's proceeding that Ashley was neglected due to an environment injurious to her health. As the court noted, Matthew does have a criminal record. In addition to the 2007 felony conviction, about four months before this child was born, Matthew committed the offense of delivery of a controlled substance, which was a Class III felony, to which he pled guilty and is still on probation. Counsel this morning has mentioned extensive counseling that Matthew has gotten, but that counseling is of little, if any, value. None of these alleged counseling sessions were part of his service plans. No input was given from DCFS to any of these counselors. Because he refused to contact them, he refused to allow DCFS to participate. There's no evidence that any of these counselors were even aware that Matthew has involvement with DCFS or has a past history with DCFS. He has refused to allow access to his probation records. There's no evidence that any of these issues were raised in his counseling. They were certainly not developed during this positional hearing. And any sort of claim that he has extensive counseling is of little, if any, value. He does have an incredibly poor visitation record. And counsel said that he has missed 15 out of 37 visits. That's not true. He's missed 22 out of 37. He has only made 15 out of 37 visits in that February to September period. And, in fact, from the time of July 31 to 2014 to the start of the dispositional hearing on September 5, he didn't make one visit with the child. Both Matthew and Ashley have intentionally chosen to live 200 miles away from their child, and Matthew is doing so without a driver's license and did so without involving DCFS, without telling DCFS they were going to do it. And the rationales given for not attending their visitations are also dubious. There's a reference been made to this motor vehicle accident. Ashley and Staley went to the emergency room after the motor vehicle accident for a couple hours. That's the extent of their treatment. That motor vehicle accident was an excuse for two months of missing visits, January and February. They couldn't come because of the motor vehicle accident. The psychological evaluation that was performed on Matthew is also important. In January of 2012, Dr. Frey performed a psych evaluation on Matthew, found him to be a narcissistic personality with controlling, domineering behavior, which dovetails into the psychological evaluation done on Ashley, which makes her vulnerable to such behavior. The trial court was troubled because none of Dr. Frey's concerns were addressed in any of the counseling that Matthew claims is extensive. There's no evidence that these counselors even knew that Dr. Frey had made this report. The preponderance of the evidence clearly supported the trial court's findings that Matthew was homeless and jobless and not able to provide a safe home and environment for the child. The poor visitation record, the counseling was of no value, and his determination not to cooperate with DCFS all support the findings made by the lower court. The evidence also supports the trial court's findings in regard to Ashley. Again, her older child, LS, was removed from her due to the drug dealing that was going on in their apartment that Ashley was aware of. She was under the control of Matthew, so much so that she was willing to let her children be threatened and remain in this position. Again, Dr. Frey performed a psychological evaluation of Ashley. She found her to have dependency personality issues, which contribute to her inability to make healthy decisions. She suffers from extreme anxiety, making her vulnerable to the influence of Matthew and raising serious concerns about her ability to protect and make healthy choices in regards to herself and her children. And again, she goes and has counseling that is of dubious value. Again, DCFS is not involved. The DCFS plan is not mentioned. Again, it is not even known if these counselors were made aware of DCFS's involvement. These counselors were lied to by Ashley about the pregnancy that she was under for her fourth child and then she's lied in court about who the father was. She's underwent what the court referred to as a sham divorce two months after the birth of this child. She did obtain a divorce from Matthew. The court felt that that was done specifically to mislead DCFS. She suggested that Matthew was not the father of her fourth child, which was belied by the fact that she later admitted that he was the father of the child. And the fact that, as this court noted, she gave this child not to her parents to be the guardian but to Matthew's parents. And this whole series of actions gave her a concern to the trial court. She has four children. She's given her oldest child to her parents to raise. She's given the youngest child to Matthew's parents to raise, and the other two are in the custody of DCFS. The court had serious concerns, and rightly so, of Ashley's ability to parent any of her children. Did she send a document when she gave the first child away saying that she was unable to parent the child? I'm not sure as I stand right here about the first child, Judge. There was a guardianship entered in favor of her parents. I know that. She left Effingham in August of 2013 without advance notice to DCFS and, again, moved to the Chicago area 200 miles away, which made visitation with LS and AS much more inconvenient. As the courts noted, there has been changes in the visitation schedule to try and accommodate her and Matthew. They've gone from two visits a week to one visit a week. They've gone down now from four-hour visits to two-hour visits. They attempted to work with them, and they still missed 22 out of 37 visits in that seven-month period. The court was also concerned that the sudden move also necessitated changes to Ashley's own service plan, and there was a gap in treatment to her because they had to find all the providers for her in the Chicago area. So all of the findings made by the lower court in this matter are well-documented, were well-reasoned, are based upon evidence, are based upon judicial notice of other court proceedings, and demonstrate that the ruling is not clearly against the manifest weight of the evidence, and we ask that that ruling be affirmed today. Thank you. Thank you very much. Counsel? Your Honor, if I could first correct something I said earlier. Opposing counsel is correct. I did misspeak. I think I had said 15 visits out of 37 were made, and that is correct. I think I had misspoke and said 22, which is the number of missed visits by that calculation. So I do apologize for that. As I was speaking earlier, I think there's not a clear ruling as to what the nature of this divorce is, and there was competing testimony. I think the lower court indicated that it may have possibly been not a real divorce in some ways. What I think happened based on the review of the testimony in this case, it looks like Matthew Staley said that he, rightly or wrongly, believed that maybe DCFS or the department would be satisfied if only he stepped out of this case. As was his position at the dispositional hearing in this case, he would prefer that the children be returned to their biological mother at the very least, if not to him. He did get a divorce. He moved out of the home where they had lived together. He withdrew from this case for a period of several months, as opposing counsel says, and I believe he did all of that with the intention of helping get these children returned, at least to their biological mother. But then he had another child with her, and she gave the child to his parents. The child judge obviously didn't believe that Matthew was going to distance himself. Well, he certainly continued to be involved in many ways. He continued to go to visitation. He continued to go to court. He drove to court together with the mother. Slept with the mother? I'm sorry? Slept with the mother? Yes, Your Honor, it does appear so. I don't think that divorced parents having a positive cooperative relationship, though, is really a reason why they shouldn't have their children returned. He was doing what he could to try to satisfy the department that he would be willing to let her have custody. Of course he would hope to be able to still visit the child, even if the child was brought to her. He went to the visits with her. He went to court appearances with her, again, not as a party for some time. He said he was stepping out, but he continued to show up to support her and to be willing to be a witness for her. He continued to be drug-free. He continued to go to counseling. He continued to do the things that he needed to do. And this was, you know, while it may appear that he had stepped out for some time, in reality I think it was part of his extensive efforts to both comply with the service plan, whether the written one or also the things that he just thought needed to be done in order to satisfy the department that these children could be returned. It was pointed out by opposing counsel that the court made a finding that he had submitted to the probation department a change of address form listing the mother's address. I just know that this is a finding made by the trial court based on the trial court's examination of probation records. After the close of this case, my client's never had a chance to provide or explain that. He wasn't asked any questions about it on cross-examination. I don't know if he was giving them a mailing address or what, and there is no record with regard to that. But I do believe that the trial court, as he said, relied on that in finding that the appellant father was not trustworthy. And I think the appellant father ought to deserve a chance to provide or explain why he would have given a change of mailing address in his probation case. Does he have a mailing address? In the probation case, he listed his mailing address as an address which was the same one. I'm sorry, I didn't hear you. In his probation case, he submitted to the probation department a mailing address. It was the same address of the appellant mother who lives with her parents. But he wasn't living there. This is at a time he testified that he wasn't, and the judge found that that was not credible based on that. But that was never something that was brought up during the actual case itself. He was never asked about it. It was never introduced as evidence. It's something that the trial court judge found after the close of arguments and researching on his own in the probation record. So his mailing address and hers were the same? That's what the trial judge found based on examining that record. But, again, there's been no opportunity to explain it or rebut it or go into that. And at this point, I would say it's not appropriate to use that as a determination that my client is dishonest. He hasn't had any opportunity to rebut it. Thank you. Thank you. Thank you very much. All right, this matter will be taken under advisement and disposition will be issued in due course. Thank you, counsel. Have a good day.